STATE of Wisconsin, Plaintiff-Respondent,

v.

Vernon L. FINK, Defendant-Appellant.

Court of Appeals

*No. 94–2365–CR. Submitted on briefs May 10, 1995.—Decided June 14, 1995.*

(Also reported in 536 N.W.2d 401.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Donald T. Lang*, assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Sharon Ruhly*, assistant attorney general.

Before Anderson, P.J., Brown and Snyder, JJ.

BROWN, J. One week before the start of a jury trial, the State informed the defendant, Vernon L. Fink, and the trial court that it would seek to introduce "other acts" evidence. Fink objected in writing and argued, among other things, that the lateness of the request denied him the opportunity to adequately investigate and prepare a defense to the allegation. The trial court denied a continuance and the "other acts" evidence was admitted at trial. We hold that the eleventh-hour motion by the State seriously compromised Fink's ability to defend against the allegation and Fink has shown that a continuance would have made a difference in the strength of his case. We reverse and remand for a new trial.[1]

Fink was charged with one count of first-degree sexual assault of a child contrary to § 948.02(1), STATS. He was alleged to have had sexual contact with his granddaughter two and one-half years earlier when she was twelve years old. Approximately two months before trial, Fink's attorney made a written demand for notification of any "other acts" evidence the State

---

[1] Although other issues are also raised, we do not address them due to our disposition.

intended to introduce. This written request was followed five days later by a formal motion to the trial court asking for an order compelling disclosure.

The record does not show disclosure being made until Monday, November 8, 1993, exactly one week before trial. At that time, the State submitted a motion to introduce evidence of "other crimes" pursuant to § 904.04(2), STATS. The State alleged that Fink engaged in sexual intercourse with the complainant's mother, Terri K., when she was the same age. Fink's attorney immediately entered a written objection to the motion arguing, inter alia, that the motion was untimely and that as a result, he would be unable to properly investigate and defend the "other acts" allegations.

On Thursday, November 11, the State apparently provided Fink's attorney with details of the "other acts" allegation. On Friday, November 12, the trial court heard the motion. At that hearing, the trial court primarily focused on whether the proffered evidence was remote and too collateral to the charge. It acknowledged that the question was a close one but decided to allow the testimony. The trial court then specifically addressed the complaint about the lateness of the State's motion and concluded:

> [A]s far as timely notice I find based upon the people that are involved here in the case, I won't grant your motion for adjournment. I find there is adequate time the next two days to prepare for other acts evidence.

At trial, Terri testified to the following: She is the natural daughter of the defendant. When she was approximately twelve years old, in 1973, she was living with her mother in Oshkosh. Her father, from whom her mother was divorced, was also living in Oshkosh at

a different location. She was closer to her father than her mother and often visited him. At some point while she was twelve years old, her father initiated sexual contact with her in his home. The contact consisted of touching of the breasts and vagina at first, but eventually escalated into intercourse. The intercourse recurred on a two or three times a week basis until just before she turned sixteen. In other words, it occurred on a continuous basis at his home in Oshkosh during the years 1973 to 1977.

In an attempt to discredit Terri, Fink adduced the testimony of his former wife, the mother of Terri. Terri's mother testified that "between '73 to '75, one of them years we were up in Oconto County living" and that they lived in Oconto county "no more than maybe a couple of years." During this time, Terri did not have contact with her father "unless she snuck." On cross-examination, however, Terri's mother acknowledged that Terri and she never got along and do not speak to each other.

Fink also called Terri's sister. She testified that she first heard about Terri's allegations in connection with this case. She also testified that the family lived in Oconto county from 1973 to 1975.

Finally, Fink himself took the stand. Regarding Terri's testimony, he admitted living in Oshkosh during the entire period from 1973 to 1977. He could not say how much contact he had with Terri during this time because "they moved; I don't know how many times; she lived on Ripon Road and from there they moved to Gillet[t], Suring, Wisconsin. . . . [I]t was '75, '74 before they came back here." Shortly after they came back, Fink said he had his probation revoked and went to jail for a period of time. He indicated that the

record was "somewhere, where ever [sic] my record would be; I honestly don't know."

To rehabilitate Terri's testimony, the State then recalled Terri to the stand. Terri admitted that she moved to Gillett but only for a year. She returned to Oshkosh where she attended school for grades six through eight and then went to high school. Thus, she claimed that the move to Gillett and the return from there took place before the period of sexual abuse. She further testified that her mother's testimony and that of her sister, concerning the move to Gillett from 1973 to 1975, was false.

The jury found Fink guilty and Fink brought post-conviction motions, again challenging the lateness of the motion to allow "other acts" evidence and also claiming newly discovered evidence bearing upon the issue. Based upon the motions and hearing testimony, the following facts are pertinent. County jail and Wisconsin Department of Justice records indicate that between 1973 and 1977, Fink was arrested and spent a brief period of time in several different jails as well as in the state prison system. Significantly, Fink was arrested in Forest county on November 21, 1976, and remained confined until February 21, 1977. He later had a probation term revoked and was sent to prison on November 29, 1977.

Arthur Lemke, who gave his present occupation as an employee of the Wisconsin Department of Corrections, testified that he once worked with Fink at a sawmill in Caspian, Michigan in the fall of 1976. He remembers Fink arriving in Forest county in the summer of 1976, having moved in with Lemke's neighbor. Thereafter, Lemke drove Fink to the Caspian Mill because Fink did not have a driver's license. Lemke recalled that Fink ended up in jail in Forest county.

Fink himself testified that he moved to Forest county during the last part of 1975 and lived with Lemke's neighbor until he was arrested in 1976. He moved back to Oshkosh following release from jail in early 1977 and was picked up for probation violation in July or August 1977. His probation was revoked in November 1977.

Terri's mother was also called at the postconviction motion hearing. She testified she was certain that Terri was in Gillett in the spring of 1975 because her husband was stabbed there during that time. The family moved back to Oshkosh following her husband's release from the hospital. Her testimony was corroborated by court records from Oconto county arising from the prosecution of her husband's attacker.

The trial court held that even though there was an element of lateness in allowing the "other acts" evidence to come in during trial, the credibility of Terri's allegations were "adequately explored during the course of trial." The trial court also pointed out that the information was available to Fink and that Fink admitted as much during postconviction testimony. The trial court further pointed out that Terri's mother and sister both testified at trial that Terri and her father did not have contact during the years in dispute. As far as Lemke's testimony was concerned, the trial court apparently felt that this was not overly meaningful since the question regarding the dates of alleged abuse was "very adequately, professionally explored."

■

We initially address the State's contention that Fink waived the continuance issue. The State posits that although the trial court expressly stated that it was denying Fink's motion for a continuance, the fact is that Fink never requested the continuance. The State

argues that Fink instead claimed to be surprised by the State's motion and used the lateness concept as a reason why the evidence should be kept out, not as a reason for a continuance. We reject the waiver argument. It is true that Fink did not file a document entitled "motion for adjournment." However, Fink's written objections did say that "[d]efendant, given the lack of timely notice, will be unable to properly investigate the allegations ('other acts' evidence)." Fink's objections also stated that "[d]efendant, given the lack of timely notice, will be unable to prepare and present a defense to the allegations." We agree with Fink that even the trial court recognized the written objections to contain an implicit request for an adjournment. The trial court denied the request on the merits. We, too, move to the merits.

It is well settled that the decision to grant or deny a continuance is a matter within the discretion of the trial court. *State v. Wedgeworth,* 100 Wis. 2d 514, 520, 302 N.W.2d 810, 814 (1981). However, our supreme court has cautioned that "the denial of a continuance may raise questions relative to a defendant's sixth amendment right to counsel and fourteenth amendment right to due process of law." *Id.* Thus, this court's task on review is to balance the defendant's right to adequate representation by counsel against the public interest in the prompt and efficient administration of justice. *State v. Echols,* 175 Wis. 2d 653, 680, 499 N.W.2d 631, 640, *cert. denied,* 114 S. Ct. 246 (1993). Denying defense counsel sufficient preparation time may act as a deprivation of effective assistance of counsel. *See United States v. Cronic,* 466 U.S. 648, 658-62 (1984). We agree with the State that "probing appellate scrutiny" of a decision to deny a continuance is not

warranted. But, this does not mean that we should ignore situations where the record reveals a correlation between a charge of insufficient preparation time and facts showing that the lack of preparation has seriously compromised the defense.

While the supreme court has directed trial courts to employ a six-factor test in determining whether to grant a motion for continuance,[2] appellate courts use a different test on review. As pertains to the issue at bar, when a party has been denied a continuance after claiming surprise, our supreme court has set forth three qualifications which must be met before we will hold the trial court's denial to be a misuse of discretion. *Angus v. State,* 76 Wis. 2d 191, 196, 251 N.W.2d 28, 31, *cert. denied,* 434 U.S. 845 (1977). These qualifications are: (1) there must have been actual surprise which could not have been foreseen; (2) where the surprise is caused by unexpected testimony, the party who sought the continuance must have made some showing that contradictory or impeaching evidence could probably be obtained within a reasonable time; and (3) the

---

[2] The six-factor test set forth in *Phifer v. State,* 64 Wis. 2d 24, 31, 218 N.W.2d 354, 358 (1974), is:

1. The length of the delay requested;

2. Whether the "lead" counsel has associates prepared to try the case in his [or her] absence;

3. Whether other continuances had been requested and received by the defendant;

4. The convenience or inconvenience to the parties, witnesses and the court;

5. Whether the delay seems to be for legitimate reasons; or whether its purpose is dilatory;

6. Other relevant factors.

denial of the continuance must have been, in fact, prejudicial to the party who sought it. *Id*.

Regarding the first qualification, the State argues that whether there was actual surprise is questionable at best. It notes that Terri's allegations were, at least in a general way, contained in the police reports which had been provided to the defense more than a month before trial. Thus, use of this evidence could reasonably have been foreseen. We disagree. What may have been in the police reports regarding "other acts" and what the State intended to produce at trial are two completely different things.[3] Fink's attorney attempted to find out almost two months in advance of trial whether the State expected to use "other acts" evidence at trial. Fink's attorney even moved to compel the State's answer. But no answer was forthcoming until a week before trial and no details about the "other acts" evidence were given to Fink or his counsel until at least the day before the Friday hearing. Therefore, it was not until shortly before the weekend prior to the start of the jury trial that the State, for the first time, specified the time period and location relating to the "other acts." Until then, there was no way to prepare evidence contradicting time, place or even the pattern. We determine that there was unforeseeable surprise.

Concerning the second factor, the State argues that contradictory or impeaching evidence could have been obtained by Fink within a reasonable time. The State argues that notice one week before trial is sufficient time to prepare a response to the evidence. The

---

[3] The police report is not part of the record. We therefore have no way of knowing just how much information the defense could have gained from reading it. We only know that the prosecutor defined the police report as being "not detailed."

State asserts that Fink therefore had more than simply the weekend to garner the necessary contradictory evidence. The State also claims that although the motion only provided general information rather than the more detailed information contained in the information provided the day before the Friday hearing, the general information did refer to incidents taking place "approximately 15-20 years ago." The State contends that this information was specific enough for Fink to begin finding contradictory information.

Again, we disagree. Time, place and pattern were essential to adequately defend against Terri's allegations. But the time, place and pattern allegations were not provided until the day before the Friday hearing on the motion and three days before the start of a Monday jury trial. Two of those days were weekend days. We find this to be significant since it is obvious that Fink would have had to trace his whereabouts sixteen to twenty years before, as well as the whereabouts of his accuser. The best way to do this is not only to find witnesses who may remember key facts, but also to use documentary evidence to piece the past together. Since many offices of record custodians are closed on the weekends, it would be difficult to adequately investigate these sources. We hold that Fink has met the second qualification.

Finally, the State argues that no prejudice ensued. Given all of the time for preparation available following trial, the State observes that the defense still leaves at least a year between 1973 and 1977 in which Fink could readily have had contact with Terri, for example, from May 1975 through June 1976 and even some periods in 1977. Although the State concedes that the new evidence "would have contradicted [Terri's] testimony

to some extent, it would also have left a significant period of opportunity and would not have undercut the essence of her statements." The State underscores that the essence of the statements is the similarity of Terri's experiences to that of her daughter. Both were accosted by the same person, in a family situation and at about the same age. That essence has not changed.

While we may agree that the "essence" has not changed, Fink's ability to call Terri's credibility into question *has* changed. We cannot predict with any degree of confidence how much the contradictory evidence would have affected the jury's assessment of Terri's credibility.[4] Terri steadfastly maintained that the move and return to Gillett occurred before she entered the sixth grade and that her mother's and sister's statements to the contrary were false. She insisted that she had a continuous sexual relationship with her father two or three times a week from 1973 to 1977. While Fink may have been able to produce witnesses to testify that they disagreed with Terri's statements about where she lived from 1973 to 1977, Fink had no time to get independent, objective and documentary evidence to support his defense. Moreover, the independent and documentary evidence would also have refreshed his memory as to his own whereabouts almost twenty years before. We conclude that given more time, Fink would have been able to find and use this evidence; and a jury should have been

---

[4] By contrast, when we find an error to be harmless beyond a reasonable doubt, it is because we *are* confident in the reliability of the verdict, despite the error. *See State v. Dyess*, 124 Wis. 2d 525, 544-45, 370 N.W.2d 222, 232 (1985).

able to assess Terri's statements in light of it. We hold that Fink was prejudiced by the denial.[5]

*By the Court.*—Judgment reversed and cause remanded.

---

[5] We observe that this case is an excellent illustration of the proper way to make a record showing prejudice. All too often, defendants complain about error but do not attempt to show how that error prejudiced them except to speculate that had the error not been made, the result might have been different. Here, the defendant has been able to produce hard evidence connecting the denial of the continuance to the compromising of his ability to defend against the "other acts" allegation.